J-A22008-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF: T.D.N.T.R., A MINOR<br><br>APPEAL OF: T.D.N.T.R., CHILD | IN THE SUPERIOR COURT OF PENNSYLVANIA<br><br>No. 725 EDA 2018 |

Appeal from the Order Entered March 20, 2018
In the Court of Common Pleas of Philadelphia County
Family Court at No(s):
CP-51-AP-0000753-2017
CP-51-DP-0001031-2015

| | |
|---|---|
| IN THE INTEREST OF: L.M.R., A MINOR<br><br>APPEAL OF: L.M.R., CHILD | IN THE SUPERIOR COURT OF PENNSYLVANIA<br><br>No. 726 EDA 2018 |

Appeal from the Order Dated March 20, 2018
In the Court of Common Pleas of Philadelphia County
Family Court at No(s):
CP-51-AP-0000754-2017
CP-51-DP-0001030-2015

BEFORE: BENDER, P.J.E., NICHOLS, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY BENDER, P.J.E.:              **FILED NOVEMBER 29, 2018**

The guardian *ad litem* ("GAL"), on behalf of L.M.R. ("L.R.") (born in April of 2011) and T.D.N.T.R. ("T.D.") (born in February of 2015) (collectively "the Children"), appeals from the amended orders entered on March 20, 2018, denying the petitions to involuntarily terminate the parental rights of E.B.

_____

[*] Former Justice specially assigned to the Superior Court.

("Father") and to change the goals for Children to adoption. After careful review, we reverse.

The trial court's extensive opinion provides a detailed explanation of the facts and procedure that led to the orders now on appeal. However, recognizing that this Court rendered a decision relating to the termination of R.R.'s ("Mother") parental rights on June 5, 2018, we include a portion of that memorandum opinion to provide a context for Father's appeal. In this Court's decision in Mother's case, we stated:

> By way of background, on April 17, 2015, the Department of Human Services ("DHS") became involved with Mother, E.B. ("Father"), and the Children upon receiving a report alleging that [T.R.] had fallen in the home and sustained nearly fatal injuries. Mother's explanation of the incident was "while she and Father were arguing, Father raised his hand as if to strike her while she was holding the [c]hild and she dropped the [c]hild on a mattress to protect him[.]" On April 20, 2015, DHS met with Mother who stated, "Mother and Father argued and Father physically assaulted her while she was holding [T.R.]; that she dropped him onto a mattress during the incident and later fell on top of him as Father continued to assault her[.] ..."
>
> [T.R.'s] diagnosis was "acute or chronic bilateral subdural hemorrhages, multilayer retinal hemorrhages in both eyes, a closed right rib fracture, and a cervical spine injury, most likely due to abusive head trauma in the absence of accidental trauma to account for the injuries." On April 21, 2015, DHS received a supplemental report alleging that, "the [c]hild was in critical condition based on suspected abuse; that he had internal bleeding from old and new injuries; and that it was not known at that time if the [c]hild would survive." The report alleged that Mother's explanation did not match [T.R.'s] injuries. Rather, the report alleged that, due to his injuries, [T.R.] "would had to have fallen from a waist-high height onto a hard surface."
>
> With respect to the older female child, [L.R.], who was nearly four years old at the time of the incident involving [T.R.], DHS learned

- 2 -

from hospital staff on April 18, 2015, that she did not appear to have any injuries. However, she "appeared to have some developmental delays and suffered from non-verbal autism[.]"

The Children were placed in protective custody on April 22, 2015. [T.R.] was discharged from the hospital on April 28, 2015, and he was placed in a foster home separate from his sister, [L.R.] The Children were adjudicated dependent on May 13, 2015. On November 10, 2015, the trial court found that aggravating circumstances existed as to Mother and Father.

*In the Interest of: T.D.N.T.R.*, No. 3185 EDA 2017, unpublished memorandum at 2-3 (Pa. Super. filed June 5, 2018) (citations to the record omitted).

As in Mother's case, the trial court here provided a discussion about the various hearings that took place, beginning in April of 2015. The trial court included information about the transfer of legal custody to DHS and the placement of Children in foster care, and each parent's explanation about the injuries suffered by T.R. The trial court's opinion also discussed Father's compliance, or lack thereof, with the objectives developed for him. For example, Father's objectives included a visitation schedule with line-of-sight supervision, attendance at the Children's medical appointments, attending Behavioral Health Services, participating and completing anger management counseling, domestic violence counseling, and parenting classes. The court's opinion provided this type of information for the permanency review hearings held through May of 2017. Notably, in April of 2017, Father finally admitted his part in the altercation that resulted in T.R.'s injuries. On August 15, 2017, the termination and goal change hearing was held relating to Mother and

resulted in the involuntary termination of her parental rights to both Children. Thereafter, due to changes of counsel representing Father, a number of continuances occurred. Then, on January 30, 2018, the termination and goal change hearing concerning Father was held.

The trial court's opinion contains the following discussion of the testimony provided by the witnesses at the January 30th hearing:

> On January 30, 2018, a hearing was held before the Honorable Allan L. Tereshko. Counsel for DHS, Michael Pratt, presented Dr. Erica Williams, Psychologist, Forensic Mental Health Services, as an Expert Witness to testify. All parties stipulated to her qualifications as an Expert in Forensic Psychology. Dr. Williams testified [that] the circumstances that brought the two Children into care occurred when T.R., at nine-weeks old, suffered a near fatal injury that was classified by medical providers to be non-accidental. The explanation the parents provided was not consistent with the injuries. She conducted a Parenting Capacity Evaluation of Father on 2/23/2017 and an Addendum on 4/05/2017. At the initial evaluation, Father reported that he was not involved and Mother was present. However, Father reviewed the PCE Report and provided a subsequent written correction statement on 4/04/2017, admitting his role in the infant's injuries. Dr. Williams then provided a subsequent Addendum to the PCE dated 4/05/ 2017. At the time of the initial Report and subsequent Addendum, it was determined that Father did not have the capacity to provide safety or permanency to either of the Children because of concerns regarding his inability to manage his own behavior and a pattern of behaviors that were observed regarding his inability to modulate his emotions. Resource parents and Case Managers having to adjust visitation because of Father's intimidating behaviors and verbal aggression.

> Dr. Williams testified that subsequent to Father's admission regarding the Child's injury, the recommendations did not change[;] however, it raised immediate concerns for the safety of the Children because Father was having unsupervised overnight visitation. At that point, she recommended the focus of mental health therapy to be a therapeutic setting where he can develop

- 4 -

an accurate and consistent narrative as to the events that occurred that day and the role he played. To address the larger patterns of his aggressive and intimidating behaviors. The pattern of aggression both verbal as well as physical would need to be evaluated and addressed. He would need to be able to recognize those behaviors and begin to understand the behavior cycle that led to him engaging in this pattern. So[,] an important part of the treatment is [to] understand what, specifically, are your diagnoses, how do they affect your day to day function and how could they interact with you as a parent. Dr. Williams further noted that attendance in treatment in itself does not mean progress. So, it would also matter whether or not that during those sessions he was motivated and even engaging in the conversations necessary to propel it forward.

On cross-examination by Emily Cherniack, Father's attorney, Dr. Williams noted that following the April Addendum to Father's PCE, it was determined that Father would receive therapy at the agency, Forensic Mental Health Services[;] however, the CUA workers chose to have Father attend another agency instead, and she did not understand what led to that decision by the CUA workers. She opined that her recommendation in the Addendum did not change because the concern was already raised. What that Addendum allowed was for Father to kind of skip that first hurdle in therapy where he was denying events. So, it would help him jump-start his therapy, but the safety concern was still completely present. Father's admission allows the therapy to not have to focus on his denial, but it allows the therapist to advance the goals with the patient. Dr. Williams finally noted that since the Report and the Addendum she has not observed any of the interactions of Father and his Children.

Beverly Ford-Green, CUA-NET Case Manager, also testified at the hearing. She began managing this case on March 9, 2017, and stated this case became known to DHS because of a near fatal incident to T.R. in April 2015, based upon physical[ly] aggressive behavior between Mother and Father. Mother had provided three different versions of what happened to the Child. Father stated it was an accident because they had an altercation and the Child fell. Medical evidence later established that the injury was almost fatal and did not match what the parents were saying to investigators and hospital staff.

Ms. Green testified Father's SCP objectives were to attend anger management classes, domestic violence counseling, … all medical appointments for both Children, ... mental health counseling, and … supervised visitation with the Children. She noted that Father completed an anger management course, parenting classes, and mental health counseling. Father was attending therapy at Panamerican Mental Health, however, they did not offer child abuse and domestic violence therapy, which was ordered by Dr. Erica Williams' PCE evaluation, and so he stopped attending there in August 2017. Father then attended Empowerment and Resource Associates on 10/27/2017, and 11/06/2017. Finally, he began therapy at New Life Community Services on 11/30/2017, and attended 1/04/2018, 1/11/2018, and 1/25/2018. He continues to attend that therapy, and is currently receiving therapies for domestic violence, child abuse and anger management. Ms. Green opined that Father needs more therapy because she observed an incident in July 2017 when Father became irate during a visit with the Children and she had to terminate the visit because the Children became scared and upset.

Regarding the visitation, Ms. Green testified she has observed the visits and since the last court date, the visits went well. She opined that Father is more bonded to his daughter, than to his son.

On cross-examination by Ms. Cherniack, Father's attorney, Ms. Green testified that after Dr. Williams' evaluation stated Father needed specialized mental health treatment, she referred Father to Menergy and the Wedge. However, Father chose to attend New Life Treatment Community Services. She stated that Father has been more cooperative with all the services that CUA provides, and that his interaction with both Children has improved. In fact, she stated Father does appropriate things with his son, T.R.[,] who is almost three years old and developmentally on target. L.R.[] is six years old and is also developmentally on target.

Yvonne Brittingham, Father's sister, also testified at the hearing on 1/30/2018. She stated she has supervised the visitations between Father and his Children since 2016, when Father moved into her home in Levittown, and she subsequently received clearance from DHS. She supervised visits on a weekly basis, sometimes two to three visits per week, totaling approximately forty visits. There were overnight visits on weekends, approximately ten to twelve weekends. She stated

Father would take the Children to the park, and swimming at the pool in the summertime. Father would also take the Children to Chuckie Cheese and the Mall and sometimes walk at the lake.

Ms. Brittingham also testified that she has observed Father's parenting skills and activities. Father bathes his son and puts him to sleep, and he also combs his daughter's hair. She notes he does many things a mother would do for their Children, and he cooks, cleans, plays and bathes them. He also helps them with their alphabet, lettering and does not treat them differently.

On cross-examination by Michael Pratt, attorney for DHS, Ms. Brittingham testified she would not lie for her brother regarding his parenting. She stated she would not be testifying if she did not believe he was a good parent. Father knows his Children have special needs, and he takes the time to sit down and talk and explain things to them. When questioned regarding if she was aware how the children came into DHS care, Ms. Brittingham stated Father told her the Child was injured and had surgery at the hospital, however she did not know the circumstances that brought the Child into the hospital.

Father was the last witness to testify. He stated he completed parenting classes for 12 or 13 weeks and presented a Certificate dated 7/15/2015. He attended various parent cafés presented by local CUA[]s. [At] [t]he café on 3/23/2017, he watched videos and filled out a work book of exercises where the parent gets to know themselves and become a better parent when you are reunited with your Children. He attended another one on 5/10/2016, where he was instructed to find balance in different situations with your Children when they are not behaving correctly, and to educate them on how to behave. Another café he attended focused on single-parent parenting, showing how to juggle life and still focus on the care and nurturing of your Child. On 12/14/2016, Father attended another café focusing on building a strong relationship with your Children, again watching videos and filling out workbooks on how to incorporate the skills seen on video into your own personal life and relationship with your Children. Father also presented a Certificate of Completion of an anger management class dated 9/1/2015. Father presented various other parenting café Certificates, and finally presented a Certificate dated 5/12/2017 for attending the Philadelphia Autism Project because his daughter is borderline autistic.

Father testified he continues mental health counseling at New Life and is focusing on Dr. Williams' recommendations of the PCE, including domestic violence, child abuse, and a solid narrative on how his son became injured. He notes he does not favor one Child over the other and misses them both. Father testified he has changed as a person and that the services provided by the [c]ourt were and continue to be very beneficial to him as a human being and as a Father. He had never experienced a situation like this before and every month is a learning process for him, to learn and apply skills about keeping calm in high-level stressful situations to ensure the safety of his Children. Father states he has done all that the [c]ourt has asked him to do, missing only three visits in the almost three years, has attended medical appointments, attended therapy and classes. He loves his Children and knows he can provide safety and permanency for them.

On cross-examination by Michael Pratt, DHS attorney, Father was questioned about what he wants to get out of going to therapy. He responded, "I want to continue discussing about my day to day situation, how I feel, and my goals. I go to a therapist to talk, to see someone who cares about what I'm going through and can give me advice. And, to nurture me on how to become a better parent."

Trial Court Opinion (TCO), 5/3/18, at 18-24 (citations to the record omitted).

The court then stated that it

is very familiar with this case from the very beginning and is familiar with all the twists and turns and ups and down of the circumstances surrounding the case. After hearing the testimony of the witnesses and considering the best interest focus, as well as the obligation to attempt reunification, this [c]ourt found it compelling to change the Children's goal from adoption back to reunification with Father. This point was not reached after any specified time period of compliance or non-compliance, but reached based upon the facts of this particular case and these particular Children.

*Id.* at 27. In reaching this conclusion, the court explained its reliance on the credible testimony of Dr. Erica Williams, Father's sister, Yvonne Brittingham, and Father. Although the court acknowledged that Dr. Williams testified that

"her opinion remains that Father cannot provide safety and permanency for his Children now," the court based its decision on "the fact that Father recognized his contribution to the injury of his Child, after his denial of the facts, and that Father has put forth the effort to begin the process of healing, remediation, learning and understanding the circumstances that placed his Children in care." *Id.* Essentially, at the conclusion of the hearing, the court stated to Father "that he had earned the opportunity to work for reunification with his Children…." *Id.* at 30.

Following the entry of the court's orders denying DHS's termination petitions as to both Children and denying the request to change the goal for both Children from reunification to adoption, the GAL filed the instant appeals on behalf of Children. In the GAL's brief, she sets forth the following issues for our review:

> 1. Did the Trial Court err as a matter of law and/or abuse its discretion when it refused to terminate the parental rights of [Father] pursuant to 23 Pa.C.S.[] § 2511(a) (1); (2); (5) and (8) and 23 Pa. C.S.[]. § 2511(b) when: (i) there was clear and convincing evidence demonstrating each prong of each ground, including, but not limited to, the fact that this matter began as a near fatality to [L.R.'s] sibling, [T.R.], nearly three (3) years ago as the result of abuse to the sibling while he was in the care of Father; (ii) there was a finding of aggravated circumstances against both Mother and Father; (iii) the Trial Court previously terminated Mother's parental rights for failing to recognize the risk that Father posed to [the Children]; and (iv) Father still had not remedied the circumstances that led to the Children's placement?
>
> 2. Did the Trial Court err as a matter of law and/or abuse its discretion when it refused to grant [DHS's] Motion for Goal Change to Adoption, and instead changed the goal back to reunification under circumstances where, five months previously, the Trial

Court terminated the parental rights of Mother and found that it was in the best interest of the Children to change their goals to adoption, and, since that finding, there has been no change in circumstances?

3. Did the Trial Court err as a matter of law and/or abuse its discretion when it refused to terminate the parental rights of Father pursuant to 23 Pa. C.S.[] § 2511(a)(1); (2); (5) and (8) and 23 Pa. C.S.[] § 2511(b) when the Trial Court suggested Father might be [a] reunification resource in the future after the same Trial Court terminated Mother's parental rights on August 15, 2017, finding that Mother was incapable of protecting the Children because she continued to suggest that Father might be a reunification resource in the future?

4. Did the Trial Court err as a matter of law and/or abuse its discretion when it refused to terminate Father's parental rights when it found that Father could potentially be a reunification resource at some unknown time in the future when the case had been open for nearly three (3) years and when the Trial Court made vastly different findings of fact five (5) months previously at the hearing in August 2017, based on a substantially similar evidentiary record, when nothing of consequence had occurred between August 2017 and January 30, 2018?

GAL's brief at 4.[1]

Appellate review of termination of parental rights cases implicate the following principles:

> In cases involving termination of parental rights: "our standard of review is limited to determining whether the order of the trial court is supported by competent evidence, and whether the trial court gave adequate consideration to the effect of such a decree on the welfare of the child."

*In re I.J.*, 972 A.2d 5, 8 (Pa. Super. 2009) (quoting *In re S.D.T.*, Jr., 934 A.2d 703 (Pa. Super. 2007), *appeal denied*, 597 Pa. 68 950 A.2d 270 (2008)).

---

[1] DHS filed a brief in support of the GAL's position; however, Father has not submitted a brief in response to the issues raised by the GAL.

> Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. … We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.

*In re B.L.W.*, 843 A.2d 380, 383 (Pa. Super. 2004) (*en banc*), *appeal denied*, 581 Pa. 668, 863 A.2d 1141 (2004) (internal citations omitted).

> Furthermore, we note that the trial court, as the finder of fact, is the sole determiner of the credibility of witnesses and all conflicts in testimony are to be resolved by [the] finder of fact. The burden of proof is on the party seeking termination to establish by clear and convincing evidence the existence of grounds for doing so.

*In re Adoption of A.C.H.*, 803 A.2d 224, 228 (Pa. Super. 2002) (internal citations and quotation marks omitted).

*In re Z.P.*, 994 A.2d 1108, 1115-16 (Pa. Super. 2010).

We are guided further by the following: Termination of parental rights is governed by Section 2511 of the Adoption Act, which requires a bifurcated analysis.

> Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between

> parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citing 23 Pa.C.S. § 2511, other citations omitted). The burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. *R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009). However, we need only agree with the trial court as to any one subsection of Section 2511(a), as well as Section 2511(b), in order to affirm. *In re B.L.W.*, 843 A.2d at 384.

With regard to Section 2511(b), we direct our analysis to the facts relating to that section. This Court has explained that:

> Subsection 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. In *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005), this Court stated, "Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." In addition, we instructed that the trial court must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond. *Id.* However, in cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists. *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa. Super. 2008). Accordingly, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case. *Id.* at 763.

*In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa. Super. 2010).

We address the GAL's argument relating to DHS's petition to terminate Father's parental rights pursuant to Section 2511(a)(8) and (b) of the Adoption Act, which provides:

**§ 2511. Grounds for involuntary termination**

**(a)  General rule**.—The rights of a parent in regard to a child may be terminated after a petition is filed on any of the following grounds:

.  .  .

(8) The child has been removed from the care of the parent by the court or under voluntary agreement with an agency, 12 months or more have elapsed from the date of the removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of the parental rights would best serve the needs and welfare of the child.

.  .  .

**(b)  Other considerations**.—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(8), (b).

In the **In re Z.P.** opinion, this Court explained that:

"[T]o terminate parental rights pursuant to 23 Pa.C.S.[] § 2511(a)(8), the following factors must be demonstrated: (1) the child has been removed from parental care for 12 months or more from the date of removal; (2) the conditions which led to the removal or placement of the child continue to exist; and (3) termination of parental rights would best serve the needs and welfare of the child." **In re Adoption of M.E.P.**, 825 A.2d 1266, 1275 (Pa. Super. 2003); 23 Pa.C.S.[] § 2511(a)(8).  "Section

2511(a)(8) sets a 12-month time frame for a parent to remedy the conditions that led to the children's removal by the court." *In re A.R.*, 837 A.2d 560, 564 (Pa. Super. 2003). Once the 12-month period has been established, the court must next determine whether the conditions that led to the child's removal continue to exist, despite the reasonable good faith efforts of the Agency supplied over a realistic time period. *Id.* Termination under Section 2511(a)(8) does not require the court to evaluate a parent's current willingness or ability to remedy the conditions that initially caused placement or the availability or efficacy of Agency services. *In re Adoption of T.B.B.*, 835 A.2d 387, 396 (Pa. Super. 2003), *In re Adoption of M.E.P., supra*.

*In re Z.P.*, 994 A.2d at 1118.

The GAL contends that by January 30, 2018, the date of the termination and goal change hearing, Children had been in placement for 2¾ years, which is well beyond the twelve month period indicated in Section (a)(8). Moreover, the GAL also points out that under Section (a)(8) the court cannot consider any efforts made by Father after the filing of the termination petition on July 25, 2017, as set forth in section 2511(b). Also, in support of the twelve-month time frame, the GAL relies on this Court's decision in *In re C.L.G.*, 956 A.2d 999 (Pa. Super. 2008), which reproduced a portion of the trial court's discussion in that case, stating:

We recognize that the application of Section (a)(8) may seem harsh when the parent has begun to make progress toward resolving the problems that had led to removal of her children. By allowing for termination when the conditions that led to removal of the child continue to exist after a year, the statute implicitly recognizes that a child's life cannot be held in abeyance while the parent is unable to perform the actions necessary to assume parenting responsibilities. This Court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future. Indeed, we work under statutory and case law that contemplates

- 14 -

only a short period of time, to wit, eighteen (18) months, in which to *complete* the process of either reunification or adoption for a child who has been placed in foster care.

*Id.* at 1005 (quoting trial court opinion, at 10 (citations omitted) (emphasis in original)). *See also* Adoption and Safe Families Act (ASFS), 42 U.S.C. § 671 et seq. The ASFA essentially provides,

that when a child is placed in foster care, after reasonable efforts have been made to reestablish the biological relationship, the needs and welfare of the child require CYS and foster care institutions to work toward termination of parental rights, placing the child with adoptive parents. It is contemplated this process realistically should be completed within 18 months.

*In re G.P.-R.*, 851 A.2d 967, 976 (Pa. Super. 2004).

In *C.L.G.*, the child was in placement for 21 months, while here, by the time the termination hearing was held, Children were in placement for 32 months. In *C.L.G.*, the circumstances revolved around the parental drug use and housing issues. In the instant case, placement in foster care occurred after the younger child's near fatal injury due to Father's assault on Mother and the discovery of the healing of the infant's old injuries. There was also a finding of a lack of parental care of the older child and a finding of aggravated circumstances. Moreover, at the termination hearing, the court found credible the testimony of Dr. Williams, who stated that although Father finally acknowledged his actions were the cause of the infant's near fatal injuries, Father was still not able to safely parent Children. We are compelled to agree with the GAL's position. To allow Children, who have been waiting almost three years for permanency, to continue in "a state of proverbial limbo in

- 15 -

anticipation of a scenario that is speculative at best," Children's needs for permanency as dictated by the ASFA would be overlooked. *C.L.G.*, 956 A.2d at 1008.

As for the needs and welfare prong of Section (a)(8), we again recognize that T.R. has spent nearly his entire life in care, while L.R. has been in care for more than half her life. Therefore, no meaningful bond between Children and Father has developed, since Father never had the responsibility of caring for Children. This was evidenced by Father's interaction with Children, when he demonstrated an inability to curb his angry outbursts during visitation. The GAL also noted Dr. Williams' safety concerns, which is part of both the Section (a)(8) and the Section (b) analysis. The GAL points out that the trial court recognized that safety was a major concern during the extended dependency proceedings and relied on that concern when terminating Mother's parental rights. However, a mere five months later, the court appears to overlook any safety concerns when denying the petition to terminate Father's parental rights. Specifically, in her brief, the GAL listed the following evidence as support for termination, which she contends was not countered by the evidence presented by Father.

- evidence of brutal abuse of T.R. (at Mother's TPR hearing, the same [t]rial [c]ourt stated that Father was "a man who has been found to have been abusive to a completely helpless infant");
- a finding of aggravated circumstances;
- uncontroverted testimony of an expert that Father was incapable of parenting and still had a long way to go, after 2¾ years; and

- evidence from the expert that she had significant safety concerns for the Children should the Father have unsupervised contact with them.

GAL's brief at 40.

Accordingly, we conclude that the evidence presented demonstrates that Father's parental rights should have been terminated pursuant to Section 2511(a)(8) and (b), that Children have been in foster care for three years, that the time frame for Father to show he had the ability to care for Children remains speculative, and that permanency at this time for Children would best serve their needs and welfare. Therefore, we agree with the GAL and conclude that the trial court erred by denying the petition to terminate Father's parental rights and refusing to grant the request to change the goal for Children back to adoption.

Orders reversed. Case remanded. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>11/29/18</u>